his wife, naming her. By virtue of the statute the property embraced within the power passed by the will to her. This property never belonged to him. His executrix took no title to it as belongirg to him. It passed by direct appointment to Louise Bucki, free from any liability to pay his debts after his death, as it had been free from such liability before his death.

[5] In providing for costs, the judgment made them payable out of the entire residuary estate of Frederica Bucki. The effect is that one-third thereof has to be paid out of the share left to Amalie Reif, in regard to which there has never been a question. She should not be called upon to pay for litigation in which she has been in no way interested. The judgment should be modified by requiring the costs to be paid out of the two-thirds in controversy. The twenty-sixth finding of fact should be reversed. There is no evidence to support it.

As modified, the judgment appealed from should be affirmed, with costs to respondent Louise S. Bucki and to the executors plaintiffs, to be paid out of the fund in controversy. All concur.

---

(162 App. Div. 818)

LANGSTROTH v. J. C. TURNER CYPRESS LUMBER CO. · (No. 5838.)

(Supreme Court, Appellate Division, First Department. May 22, 1914.)

1. SALES (§ 52*)—REMEDIES OF BUYER—ACTIONS FOR BREACH OF CONTRACT—WEIGHT AND SUFFICIENCY OF EVIDENCE.

Evidence, in an action by the buyer's assignee for breach of a contract for the sale of 350,000 feet of lumber, *held* to show that the contract was entered into and a memorandum thereof made as alleged.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 118–144, 1045; Dec. Dig. § 52.*]

2. PRINCIPAL AND AGENT (§ 123*)—POWERS OF AGENT—EVIDENCE ·AS TO AUTHORITY—WEIGHT AND SUFFICIENCY.

Evidence *held* to show that the seller's agent acted within the actual and apparent scope of his authority in making a contract for the sale of 350,000 feet of lumber.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 420–429; Dec. Dig. § 123.*]

3. PRINCIPAL AND AGENT (§ 103*)—POWERS OF AGENT—CUSTOM AND USAGE.

An actual practice of an agent to make contracts of sale was sufficient to override contrary instructions given years before.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–293, 353–359, 367; Dec. Dig. § 103.*]

4. PRINCIPAL AND AGENT (§ 103*)—POWERS OF AGENT—SALES.

While every salesman presumably has to get the price at which he sells from his employer, that would not invalidate a sale by an authorized salesman at a price not approved by his employer.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–293, 353–359, 367; Dec. Dig. § 103.*]

5. PRINCIPAL AND AGENT (§ 103*)—POWERS OF AGENT—APPARENT AUTHORITY.

By permitting its agent to write a letter in answer to a prospective buyer's inquiry, from which it would be assumed that he had general powers in its business, the principal impliedly held him out as having authority to make the sale in controversy.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–293, 353–359, 367; Dec. Dig. § 103.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

6. FRAUDS, STATUTE OF (§ 116*)—SUFFICIENCY OF WRITING—SIGNATURE OF AGENT.

Under the statute of frauds (Personal Property Law [Consol. Laws, c. 41] § 31), declaring void agreements for the sale of goods at a price of $50 or more, "unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent," a memorandum of a sale of 350,000 feet of lumber, setting forth the parties, the subject-matter, and the terms, and signed by H. who was acting as agent for the defendant, was valid and enforceable against defendant, where it was not apparent from the memorandum that H. was acting as agent, since, the contract being sufficient and enforceable as against H., it could be enforced against his principal.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 251–260; Dec. Dig. § 116.*]

7. FRAUDS, STATUTE OF (§ 111*)—SUFFICIENCY OF WRITING—SUBJECT-MATTER.

A memorandum, reciting the sale of "1 cargo (of lumber) up to 350 M—H & P option of increasing to 500 M if J. C. Turner has stock," sufficiently stated the quantity sold as 350,000 feet, with an option of increasing it to 500,000 feet, so as to be valid under the statute of frauds (Personal Property Law [Consol. Laws, c. 41] § 31).

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 237; Dec. Dig. § 111.*]

8. SALES (§ 418*)—REMEDIES OF BUYER—ACTIONS FOR BREACH OF CONTRACT—DAMAGES.

The measure of damages for the seller's breach of a contract of sale is the difference between the purchase price and market price at the time and place of delivery; and, where the time is not fixed, it must be fixed as at a reasonable time, which must depend upon the circumstances of the case.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174–1201; Dec. Dig. § 418.*]

9. SALES (§ 418*)—REMEDIES OF BUYER—ACTIONS FOR BREACH OF CONTRACT—DAMAGES.

The measure of damages for breach of a contract, made in September to sell a cargo of lumber, for which the time of delivery was not specified, was the difference between the contract price and the market price the following spring, where it was shown that the following spring would be a reasonable time for delivery.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174–1201; Dec. Dig. § 418.*]

Appeal from Judgment on Report of Referee.

Action by Francis D. Langstroth against the J. C. Turner Cypress Lumber Company. Judgment for plaintiff after a reference, and defendant appeals. Affirmed on opinion of the referee.

The following is the opinion of Charles C. Nadal, Referee:

This action is brought to recover damages for the breach of an alleged contract made on September 11, 1905, whereby the defendant sold to the plaintiff's assignors, Henson & Pearson, 350,000 feet of lumber. The contract is in the form of a pencil writing in the memorandum book of Henson, and is as follows: "Sept 11th 1905 Sold H & P—1 cargo up to 350 M—H & P option of increasing to 500 M if J. C. Turner has stock—22.00 Cif Phila—Basis 5.25 freight H & P to get benefit of any lower freight Terms free wharfage 2% on discharge Less freight 80 of clear K Dried 4/4 saps—Small % of 5/4 if possible Inspection guaranteed M J E Hoban"

The defendant denies the making of the contract, denies that Hoban, who signed the memorandum, had authority to make any such contract on its be-

half, and alleges that the contract is within the statute of frauds, and therefore void.

[1] I. As to the making of the contract: Henson testified that on the evening of September 11, 1905, he, Hoban, Mrs. Hoban and a friend dined together at a restaurant in New York City, and that the alleged contract was entered into and the memorandum made and delivered on that occasion, and that one or two days later Hoban notified him that the quantity could not be increased above 350,000, as Mr. Turner had sold all the balance of the boards. Hoban's testimony was substantially to the same effect. There is practically no contradiction of this evidence. The testimony of Mr. Bull as to his conversation with Hoban would not, I think, justify the conclusion that the contract was not made as testified to by both Henson and Hoban. It was natural that Hoban should evince a desire to carry out his employer's wishes.

[2] II. As to the authority of Hoban to make the sale: Hoban says that before making the sale Turner expressly authorized it. Turner, on the other hand, says he directed Hoban not to make the sale. Thus we have a flat contradiction as to instructions given as to making this sale.

[3, 4] Hoban testifies that he had been in the employ of the defendant for nine or ten years, and for six or seven years had been engaged in selling lumber for defendant; that his position was that of assistant to the president, his duties being inside the office; he made sales and signed contracts for the sale and delivery of lumber every day, sometimes two or three times a day; that he had charge of the office during the absences of the president; that no one was allowed to take orders, even over the telephone, but Turner and himself, but that he had to consult Turner about prices. The witness, McHugh, bookkeeper for defendant, corroborates the testimony of Hoban as to the latter's position and duties, and the work Hoban actually did. He said that the persons who actually made sales were Turner, Hoban, and Lloyd, an outside salesman, and when orders came in they were reported to one of these persons. The testimony of these two witnesses as to the actual practice followed in conducting defendant's business indicates that Hoban had very general powers in the matter of selling lumber, being apparently limited only by the necessity of consulting Turner as to prices. The only evidence in contradiction of the testimony of these two witnesses was that of Mr. Turner, president of defendant. He testified that he hired Hoban; that he told Hoban his duties were to answer telephone inquiries, and if any one asked them to ship lumber to take down the order and submit it to him (Turner). He also authorized Hoban to answer letters when Turner was away, but any quotations he made were to be referred to Turner. Turner also testified that he never told Hoban he could make contracts for the sale or future delivery of lumber, and never knew Hoban to sign any contract for such sale or delivery. This is the substance of Turner's testimony so far as the duties or powers of Hoban were concerned. It does not appear when Turner gave Hoban the instructions as to his duties. It was apparently at the time of hiring, nine or ten years before the sale. The actual practice that grew up, and was apparently being followed at the time of the sale in question, would of course, override the instructions. Besides, the instructions are not necessarily in conflict with authority to sell. They contemplate that Hoban would quote prices, such quotations to be referred to Turner. Surely an agreement made or price quoted by Hoban would be binding on defendant even if Turner thereafter found it unsatisfactory. Hoban had to consult Turner about prices. Every salesman presumably has to get the price at which he sells from his employer, but that would not invalidate a sale made by an authorized salesman at a price not approved by the employer. Besides, there is no claim in this case that the price at which the sale was made was unsatisfactory. On the contrary, Turner says in his letter of October 8, 1905, that "the price is O. K."

[5] Whatever may be the truth as to the instructions given to Hoban concerning this particular sale, I cannot avoid the conclusion that Hoban did have, or at least assumed, with the knowledge of the defendant, to have, general authority to accept orders and make contracts for the sale of lumber, being limited only as respects prices quoted. The letter written by Turner to Hoban, dated October 8, 1905, seems to confirm this view. He there says:

"Not having heard from Henson as to K. D. saps and as price is firmer and as T. C. Co. are not making enough to get third cargo probably till April and as they may sell out it would be advisable not to accept the order if he sends it. The price is O. K. but the other conditions are not, just at present. Might say that T. C. Co. are about to sell their Y. P. and hence not in position to take order, though if they want to take a small cargo of say 300 M. and subject to our being able to furnish it April or later, it will be O. K. For the present we had better not work on Y. P."

This letter shows that Hoban did make sales, and the expressions used indicate that the writer is addressing a person having rather broad powers. If Hoban could only make sale when told to do so, one would have expected the letter to be couched in different terms. Thus he says, "It would be advisable not to accept the order," and, "for the present we had better not work on Y. P." He is apparently expressing merely his views, leaving Hoban to follow them or not as he sees fit. Besides, this letter shows that Mr. Turner knew at least something about the Henson & Pearson matter, apparently regarding negotiations as still pending. He says, "the price O. K." but that other conditions are not so. What conditions are unsatisfactory does not appear. He further says that if they (Henson & Pearson) want to take a cargo of, say, 300,000 subject to same being furnished April or later, it will be all right. The sale made seems to come very near to being about what Turner says would be satisfactory.

Furthermore, McHugh testifies that about the time the sale was alleged to have been made, Turner mentioned to him that this "order or sale, or whatever it was," was not satisfactory. Turner does not positively contradict this testimony, he merely says that he does not recall this conversation.

Still another point which seems to me to be of importance is the correspondence that took place between Henson & Pearson and the defendant some months prior to the sale. On November 14, 1904, Henson & Pearson wrote to the defendant as follows: "Do you handle any other kind of lumber than Cypress? If so, please state upon what you are in position to quote to advantage."

That letter was answered on November 9, 1904, by Hoban, on the letter paper of the defendant, as follows: "We are in receipt of your favor of November 4th. In reply beg to advise that just at present we are not handling anything but Cypress. A little later on we may arrange to market the output of our own yellow pine mills, but at present we will not do this. You might correspond with the Ocmulgee River Lumber Co. at Lumber City, Ga., when you are needing any yellow pine flooring or when you are in the market for interior Pennsylvania car load deliveries of yellow pine and they will be glad to quote you. Thanking you for your favor, we are, Yours very truly, J. C. Turner Cypress Lumber Co., M. J. E. Hoban."

I cannot but feel that Henson & Pearson upon receiving such a letter as that, signed by Hoban, in reply to their letter were justified in understanding that Hoban was a person of some general powers in the defendant's business. It is not claimed that this letter was unauthorized. By permitting Hoban to write such a letter the defendant held him out impliedly as having authority to act for defendant in the matter of the sale of lumber.

I am led, therefore, to the conclusion that Hoban in making the contract acted within the scope of his actual and apparent authority.

[6] III. Is the contract within the statute of frauds and hence void? Our statute reads:

"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking. * * *

"6. Is a contract for the sale of any goods, chattels or things in action for the price of fifty dollars or more, and the buyer does not accept and receive part of such goods, or the evidences, or some of them, of such things in action; nor at the time, pay any part of the purchase money." Consol. Laws, c. 41, § 31.

The defendant's contention is that the contract is void because it does not name any vendor other than Hoban who signs the memorandum, and he cites

in support of his contention the case of Mentz v. Newwitter, 122 N. Y. 491, 25 N. E. 1044, 11 L. R. A. 97, 19 Am. St. Rep. 514. That was an action to recover from the purchaser of real estate at auction the difference between the amount bid and the sum for which the real estate was subsequently sold upon refusal of the purchaser to complete his purchase. The memorandum of sale was signed by the auctioneer, but the vendor's name did not appear. The court stated the rule to be that to make the memorandum conform to the statute the essentials, which must appear either from the memorandum itself or from a reference therein to some other writing, are "the subject-matter of the sale, the terms and the names or a description of the parties," and held that, inasmuch as the vendor's name did not appear in the memorandum, the contract did not conform to the statute, and was therefore void.

In Ward v. Hasbrouck, 169 N. Y. 407, 62 N. E. 434, following the Mentz Case, the court reached the same conclusion, laying stress upon the fact that the agent who signed the letters which constituted the contract, signed them as agent. These and other cases to like effect cited in the defendant's brief are not, as it seems to me, applicable to the case at bar. They all proceed upon the theory that the agent acting avowedly as agent for some one else whose name does not appear in the memorandum is not liable under the contract, and therefore no one is indicated against whom the contract can be enforced. There is a clear distinction between such a case and one where the person signing the memorandum acts, so far as the memorandum discloses, for himself, and is therefore personally liable under the contract. Such a contract obviously could be enforced as between the parties named in it, and therefore must be in conformity with the statute. My attention has not been called to any case where it has been held that a contract which upon its face is complete, showing all the essentials necessary to take it out of the statute, is not enforceable merely because one of the parties named, apparently acting on his own behalf, was in fact acting for an undisclosed principal. And when such a contract is made in a form that fully satisfies the statute, and is therefore enforceable as between the parties named, can it be that it is not enforceable as against the undisclosed principal of one of those parties? I know of no authority for such a proposition. On the contrary, the cases hold that such a contract is in conformity with the statute and can be enforced against the principal.

In Dykers v. Townsend, 24 N. Y. 57, one Hoyt, acting so far as the memorandum disclosed for himself, but actually for another, purchases shares of stock from the plaintiff and the court held that the contract conformed to the statute of frauds, and could be enforced against Hoyt's principal. The court there said: "It seems to have been too long and too well settled that an action can be maintained against a principal, upon a contract for the sale of goods made by an agent in his own name, to be now changed, whatever we may have thought of it as an original question; and this as well where the contract is within the statute of frauds as where it is not."

In Briggs v. Partridge, 64 N. Y. 357, 21 Am. Rep. 617, Mr. Justice Andrews, citing the Dykers Case and others, said: "The plaintiff invokes in his behalf the doctrine that must now be deemed to be the settled law of this court, and which is supported by high authority elsewhere, that a principal may be charged upon a written parol executory contract entered into by an agent in his own name, within his authority, although the name of the principal does not appear in the instrument, and was not disclosed, and the party dealing with the agent supposed that he was acting for himself, and this doctrine obtains as well in respect to contracts which are required to be in writing, as to those where a writing is not essential to their validity."

The Briggs Case has been frequently cited and approved in later cases. See Nicoll v. Burke, 78 N. Y. 580; Woodhouse v. Duncan, 106 N. Y. 527, 13 N. E. 334; Brady v. Nally, 151 N. Y. 258, 45 N. E. 547; City Trust Safe Deposit & Surety Co. v. American Brewing Co., 182 N. Y. 285, 74 N. E. 948; Case v. Case, 203 N. Y. 263, 96 N. E. 440, Ann. Cas. 1913B, 311.

In Salmon Falls Manufacturing Company v. Goddard, 14 How. 446, 14 L. Ed. 493, the court said: "Extraneous evidence is also admissible to show that a person whose name is affixed to the contract acted only as agent, thereby enabling the principal either to sue or to be sued in his own name; and this,

though it purported on its face to have been made by the agent himself, and the principal not named."

Though there is some apparent confusion among the cases, that confusion arises, as it seems to me, chiefly from the use of inexact terms.

In the case of Mertz v. Hubbard, 75 Kan. 1, 88 Pac. 529, 8 L. R. A. (N. S.) 733, 121 Am. St. Rep. 352, 12 Ann. Cas. 485, the court points out the distinction quite clearly   After stating the rule that a memorandum in order to meet requirements of the statute must give the names of the contracting parties, the court says: "Where a written agreement for the sale of lands is entered into by two competent persons, each apparently acting for himself, the requirements of the statute of frauds are fully met, and the result is a valid and enforceable contract. Being then complete it has no further concern with the statute. It is like any ordinary written contract. Parol evidence cannot vary its terms, but may add a new obligor or obligee by showing that one or the other of the parties was in fact acting as the authorized agent of a third person.   The authorities are practically unanimous on this proposition. * * *   But when the writing discloses that one of the persons in avowedly acting as an agent for some one else, who is not named or described, an entirely different situation is presented. An imperative requirement of the statute is that the memorandum must indicate the parties." See, also, Editor's Notes, 24 L. R. A. (N. S.) 315.

In this case we have a complete contract upon its face between Hoban and Henson & Pearson. All the essentials necessary to satisfy the statute of frauds are present. The parties, the subject-matter, and the terms are all set forth. The statute having thus been satisfied, the contract could have been enforced as against Hoban, and hence can be enforced as against Hoban's principal.

[7] I cannot agree with the defendant's counsel that the quantity of lumber to be sold is not fixed. The contract as I read it plainly provides that one cargo of 350,000 feet of lumber is sold to Henson & Pearson, with an option in the latter of increasing the quantity to 500,000 feet if J. C. Turner has stock. Henson & Pearson, so far as appears, never attempted to exercise this option. Whether they could have done so, or how, is unimportant.

[8, 9] IV. As to the measure of damages: The measure of damages in such a case is the difference between the purchase price and the market price at the time and place of delivery. Saxe v. Penokee Lumber Co., 159 N. Y. 371, 54 N. E. 14. Where no time of delivery is fixed by the contract the market price must be fixed as at a reasonable time (Kipp v. Wiles, 3 Sandf. 585), and what shall be taken to be a reasonable time must depend upon all the circumstances of the case (Sloan v. McKane, 131 App. Div. 244, 115 N. Y. Supp. 648). The evidence here is that a reasonable time for the delivery of a cargo of lumber of the kind in question is two, three, or four months. It also appears that in January or February Hoban told Henson that the lumber would be delivered in the spring, to which Henson apparently made no objection. This it seems to me may be fairly regarded as determining what shall be deemed a reasonable time, and that the measure of damages should be the difference between the price named in the contract and the market price in the spring of 1906. Several witnesses testified as to the market prices of lumber, the lowest price given during the spring and summer of 1906 being from $27 to $28 per thousand feet. I think, therefore, that $27 should be taken as the market price at the time when delivery should have been made, and that the plaintiff is entitled to recover the difference between that price and the price named in the contract.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

H. Bull, of New York City, for appellant.
C. F. Williams, of New York City, for respondent.

PER CURIAM.   Judgment affirmed, with costs on opinion of the referee.   Order filed.